JAMES E. WINWARD, Admr., *vs.* LEVI C. LINCOLN *et al.*

PROVIDENCE—JANUARY 14, 1902.

PRESENT: Tillinghast, Rogers, and Douglas, JJ.

(1)  *Contracts.  Conflict of Laws.*

A note dated in Woonsocket, R. I., was delivered to plaintiff in Boston, Mass.  The consideration was an indebtedness arising out of transactions in Boston, carried on by plaintiff as broker for defendants, in certain stocks.  Defendants gave orders to plaintiff by telephone or letter from Woonsocket.  The acts of the plaintiff as broker were performed in Massachusetts :—

*Held,* that the note was a Massachusetts contract, and unless the dealings were valid in Massachusetts the note was without consideration.

(2)  *Conflict of Laws.  Lex Fori.  Contracts.*

A contract valid in the place of its inception, yet contrary to the public policy of Rhode Island, will not be enforced in the courts of this State.

(3)  *Stocks and Stock-Brokers.  Wagering-Contracts.*

Pub. Laws Mass. 1890, cap. 437, § 2, provides : " Whoever contracts to buy or sell upon credit or upon margin any securities or commodities, having at the time of contract no intention to perform the same by the ·actual receipt or delivery of the securities or commodities and payment of the price, or whoever employs another so to buy and sell on his behalf, may sue for and recover in an action of contract from the other party to the contract, or from the person so employed, any payment made or the value of anything delivered : *provided,* such other party or other person so employed had reasonable cause to believe that no intention to actually perform existed."  Section four of the statute prescribed certain rules of evidence :—

*Held,* that the material question under this section was whether one party to the transaction intended that the other should make actual purchases and sales of stock on behalf of the former and should actually receive and deliver the same, and if not, whether the other party had reasonable cause to believe that the intention of the former was not so to purchase and receive or the circumstances were such that a knowledge of such intention might reasonably be imputed to him.

*Held,* further, that when a party bought and sold himself, his intention to take and deliver was important ; so, when he employed another to buy and sell, his intention as to what the agent should do was material.

*Held,* further, that the fourth section of the statute had application only in the courts of Massachusetts, the court in the case at bar being concerned only with the implication of the statute making void the contracts which it describes.

(4) *Wagering-Contracts. Public Policy.*

While in Rhode Island no statute condemns wagering-contracts, yet the spirit of the laws making gambling, bets, and wagers misdemeanors makes it clear that public policy forbids the enforcement of all wagers by the courts.

(5) *Stocks and Stock-Brokers. Marginal Transactions. Wagering-Contracts.*

It is not unlawful to buy stocks with the intention of selling again at a profit, nor to do this through a broker, nor to allow the broker to hypothecate the stock in the meantime to raise part of the purchase money. The law does require that the stock should be in existence, and that the customer should acquire such control by the purchase as to be able to deliver the title to it if called for when he sells. It makes no difference whether the certificates are delivered to the customer if his agent, the broker, acquires dominion over them.

The bargain must contemplate the actual delivery, if desired, and the actual payment of the whole price, if demanded. It must confer on the purchaser the right to have the stock transferred to him on payment for it. If it does it is a purchase, whether the stock is actually transferred to him or not.

If the agreement between the parties does not contemplate an actual purchase, but merely a payment by one party to the other, or by the ostensible purchaser to his broker, if the stocks decrease in market value ; and a payment by the broker to his customer if the price rises in the market— then, no matter what form the transaction is put in, verbally or in writing, it is merely a wager on the fluctuation of the market values and not enforcible at law.

The question is not whether the parties privately intended to enforce the agreement or to fulfill it, but what they bound themselves to do.

(6) *Wagering-Contracts. Burden of Proof.*

Where the transaction is on its face a genuine one, the burden of proof is upon the party attacking it to show its falsity.

ASSUMPSIT on promissory note. The facts are fully stated in the opinion. Jury trial waived, and certified to the full bench. Judgment for plaintiff.

DOUGLAS, J. This action, commenced November 7, 1898, is brought by the administrator with the will annexed of Frank W. Prescott, who in his lifetime was a stock-broker in the city of Boston, doing business under the name of F. W. Prescott & Co., against Levi C. Lincoln and Charles H. Gorton, of Woonsocket, R. I., to recover the amount of a promissory note for $1,503.21, bearing date Woonsocket, R. I.,

December 30, 1895, made by the defendants payable to their order on demand at any bank in Boston, and indorsed in blank by them. The declaration also contains the common counts for money had and received, for money laid out and expended, for money lent and advanced, and for interest.

The defendants plead the general issue, with affidavits of defence which set out in substance that the note was made without consideration; that it was given under a mistake of fact, for a supposed balance of account due from the defendants to the plaintiff's intestate; that the account upon which the note was predicated represented only wagering-contracts between the defendants and the plaintiff's intestate upon the price of stocks, in pursuance of which settlements were agreed to be made on margins; that no stocks were actually bought and sold, and it was the intention of the parties that there should be no actual sales and deliveries; that the contract should be construed under the laws of Massachusetts, and under these laws is void.

(1) The first claim is based upon the statement that the note in question was not given on the day of its date, but on December 21, 1895; and not in settlement of the account at all, but as an accommodation on consideration that the plaintiff's intestate should carry the defendant's stock or account further.

The testimony of the defendants upon this point is not consistent with itself, nor with the undisputed facts in the case. They say that they went to Boston by early train on December 21st; that a consultation was had between them and the broker, which resulted in their giving a note to be used by him to raise money to be applied as a margin for carrying their account further; that it was subsequently discovered that the note represented a sum $1,500 larger than the balance really due from them; that the note then given is the note now sued upon. The defendants undoubtedly went to Boston on the 21st, as they say, and some arrangement with regard to their account was made; but we cannot believe, upon their uncorroborated testimony, that it was such as they claim. No doubt a rough statement was then made of their account, based on the closing quotations of the day

before, and the proposition was made to give a collateral note to be discounted and used as margin, and such a note seems to have been given. But this was not the final arrangement. The note then given was probably a time note for a round sum, and would certainly not have been dated nine days in the future. Such a note as is now produced, if post-dated, could not have been offered for discount at any bank and would have been useless for the purpose suggested by the defendants. As a matter of fact, the stocks were sold the same day. According to the time which the defendants. fix for their visit, the orders to New York must have been sent while they were in the broker's office, or immediately after. Defendant Lincoln testifies: "Q. After you had signed the note and left Mr. Prescott's private office, where did you go? A. We went through the outer office and noticed the quotations on the stock—of these special stocks—at that time, which were much higher than the figures Mr. Prescott had figured them at, then we passed on Tremont St.," etc. "We got on the train, and we took these figures and figured it out and saw that Mr. Prescott had made a tremendous mistake. We came back to Woonsocket, and the first chance I got I wrote him that fact." The other defendant testifies: "We left Mr. Prescott's office—that is, his private office, passed out in the corridor and I said to Mr. Lincoln, 'Let us. look in the blackboard room.' We looked in the blackboard room and saw that the stocks in which we were interested were much higher than the basis that had been told us that our account stood.

"Q. Did you do anything then, go anywhere? A. We went immediately back to Mr. Prescott's office. Q. Together? A. Yes sir. Q. Whom did you see when you went back to Mr. Prescott's office? A. Mr. Prescott. Q. What did you say to him? A. We called his attention to the fact that the stocks were very much higher than he had given us. Q. What did he say? A. Mr. Prescott said: 'It is all right, boys, I am glad of it; that lets us all out.' We asked him if he wanted our note then. He said 'No;' that is, said: 'We will keep your note because the market fluctuates so

that it is liable to go considerably lower ; ' and that was the understanding when we left the office—that he would return the note to us provided the stocks let us out." One circumstance the defendants agree upon with absolute certainty, viz.: That the note made on the 21st was based on the quotations of December 20th, and that these were lower than those of the 21st and afterwards. It is certain, then, that the note now sued upon is not the note given on the 21st, as it represents the exact balance shown by the broker's books after the sale of the stocks at the prices of the 21st, and after a further credit of a dividend of $40, payable on the 31st of December.

The note made on the 21st we think was either returned to the defendants when the second note which is now in suit was made, or else was destroyed ; for no trace of such a paper has since come to light.

We believe that the defendants, when they saw that their stocks were rising in the market on the 21st and went back into the broker's private office, consented to his selling ; and afterwards, on the 30th of the month, when the account of sales was made up, gave the note now in suit.

The expressions in Lincoln's letter to Prescott are consistent with this view of the facts. He says, December 24th : "Yours of 23rd inst. rec'd. Mr. Gorton and myself were just about to call you up by L. D. Telephone when we received your letter. We were going to say to you that if you really desired to help us out, for you to purchase back for us the stocks sold under the excitement of the moment before they reach their old price, and upon their present low basis. Your clerk the other day made an error of one thousand dollars in his hurry, and the sum total as stated by him frightened us. The note given you covers amount due you and about $1,500 over that amount," and again, "We are both sorry now that the stocks were sold out, as the note given amply covered them." This is not a protest against the sales as unlawfully made, but the expression of a regret at what had been done by them all in haste ; and the note covering a larger balance than was due after the 21st, and $1,500 more, was not the note now in suit.

Mr. Prescott replied on the 26th, as follows: "Yours of the 24th received. I can appreciate the position you and Mr. Gorton are in, and you can rest assured that I will do everything in my power to help you out. You can understand the excitement under which everybody labored when you were in the other day. We have been in quite a number of panics, but I never saw anything like the one we had this last week, and it was natural that mistakes should be made. When our clerk figured up your account it was figured at extremely low prices so as to include losses and the margin required on the account. It would be better for you to come and see me personally and explain the situation you are in. I shall probably not be in the office Saturday, but will be here the first of next week. Next Wednesday is a holiday in New York and will be in Boston in this business. Please let me know when you think you will come up."

This is the last communication from Prescott which is in evidence, except one through his clerk of January 15, which does not throw any light on the situation. Mr. Stonemetz, who was clerk for Prescott, testifies that the defendants came to Boston on Monday, the 30th of December, and settled their account with Prescott by giving the note now in suit. The defendants both say they do not remember to have seen Prescott after the 21st, but do not positively deny that they visited Boston on the 30th. Mr. Stonemetz is strongly corroborated by the note and the account. The note was written by him and dated with the rubber stamp used in the office. If the date were not correct, it is strange that none of the parties noticed it. A statement of the account striking a balance was mailed to the defendants at 3:30 P. M. December 30, as was natural if they had been in Boston and finally adjusted the matter that day. If the account were still running, the statement ordinarily would have been sent on the 31st, the last day of the month. The statement itself contains items of interest reckoned to the 30th, which go towards determining the balance. The sale prices of the stocks are those of the 21st, but they are credited on the 23rd, the next Monday, when actual deliveries and payments would be made.

When the note was drawn the parties must have had these computations before them and also had in mind the dividend of $40 payable the next day, which is deducted from the balance shown by the account.

We have little doubt that the note was given on the day that it bears date, and that, in settling the amount, any mistake in the account on which the former note was based was properly adjusted.

After the death of Prescott, which occurred January 19, 1896, the defendants renewed their complaint that there had been a mistake in the account, and they were informed that they would be given an opportunity to straighten matters out ; but it does not appear that at any time since then they have made any attempt to point out the alleged mistake. There is no evidence in the case to show what the mistake was or what is the amount of it. Only the bare assertion that the note of $1,503.21 is $1,500 larger than it ought to be.

The defence of illegality is one which merits serious consideration. Upon this issue the plaintiff contends that the transactions between the parties are to be judged by the law of Rhode Island, but that if tried by the law of Massachusetts they are not unlawful.

The question is not without difficulty. The note is clearly a Massachusetts contract. Though dated in Woonsocket, R. I., it had no validity as a promise until negotiated, and was first given such validity when it was delivered to the plaintiff's intestate in Boston, Mass. But the consideration for it was an indebtedness growing out of transactions in Boston and New York (or in Boston alone, if no actual purchases and sales were made). And these transactions were carried on by the plaintiff's intestate at Boston as agent of the defendants, who lived in Woonsocket and who gave orders to their agent by telephone or by letter from there. It is argued with plausibility that the relation of principal and agent was thus created in Rhode Island, and hence that the acts of the agent directed by the defendants in Rhode Island must be held valid if not illegal there, citing *Perry* v. *Mount Hope Iron Co.*, 15 R. I. 380 ; *Hunt* v. *Jones*, 12 R. I. 265 ;

Dicey on Conflict of Laws, 617, title Contracts through Agents.

We think the argument misinterprets the authorities quoted. The first case holds that a contract made by offer from Massachusetts, accepted by telegram from Rhode Island, was completed by the sending of the telegram. In the other case the contract was made in Rhode Island, to be performed in New York. The citation from Dicey relates to the appointment of an agent in the same country, and holds that the scope of his employment is governed by the law of that country. Though in the case at bar the parties had some preliminary conversation together in Woonsocket, no order was given at that time and no relation of principal and agent was entered into. The plaintiff's intestate first became broker for the defendants when in Boston he received and accepted their first order. And in this case also the acts of the broker, as agent of the defendants, were performed in Massachusetts; and it is the validity of these acts, not of his appointment, upon which the consideration of the note depends. We think, therefore, that, if these dealings were not valid in Massachusetts, the note was without consideration. In the recent case of *Clews* v. *Jamieson*, 21 Sup. Ct. Rep. 845, opinion by Mr. Justice Peckham, May 27, 1901, which is very instructive on the whole subject of wagering-contracts, the complainants were residents of New York and the transactions in question were made by their brokers in Chicago, and the court consider these transactions as governed by the law of Illinois, including Mr. Justice Harlan, who dissented from the conclusion of the majority of the court on the merits of the case. If they were valid in Massachusetts, however, yet were contrary to the public policy of Rhode Island, no recovery can be had here. As was said in *Hunt* v. *Jones, supra*, " A contract may be valid by the law of both places " (*i. e.*, the place where it is made and the place where it is to be performed) " and yet fail practically if the *lex fori* does not permit its enforcement," citing *Leroux* v. *Brown*, 12 C. B. 801. See also *Rousillon* v. *Rousillon*, 14 Ch. D. 351, 369. As the alleged defect in the contracts

made between these parties involves the question of public policy, we must examine these transactions with reference to the law in both States at the time they took place. In Massachusetts at this time there was in force an act, chapter 437, Public Laws 1890, the material provisions of which are as follows :

"SECTION 1. In this act securities shall mean and include all evidences of debt or property and options for the purchase and sale thereof, shares in any corporation, joint stock company or association, bonds, coupons, script rights, choses in action, and other evidence of debt or property and options for. the purchase or sale thereof. And commodities shall mean and include everything movable that is bought and sold.

(3) "SECTION 2. Whoever contracts to buy or sell upon credit or upon margin any securities or commodities, having at the time of contract no intention to perform the same by the actual receipt or delivery of the securities or commodities, and payment of the price, or whoever employs another so to buy and sell on his behalf, may sue for and recover in an action of contract from the other party to the contract, or from the person so employed, any payment made or the value of anything delivered : *provided*, such other party or other person so employed had reasonable cause to believe that no intention to actually perform existed.

"SECTION 4. In any proceeding under this act the fact that the seller or the person employing another to sell in his behalf does not own the securities or commodities at the time of the contract of sale or at the time of the giving of the order to sell, and the fact that settlements had been made without the actual delivery and receipt of the securities and commodities bought or sold shall each of them be *prima facie* evidence against both contracting parties and against the person employed by either of the contracting parties to make such contract in his behalf that no intention originally existed to actually receive and deliver the subject of the contracts and that the contracting parties, the persons employed to make such contracts, and any employee of them or either of

them had reasonable cause to believe that no intention to actually perform existed ; and the parties liable under this act shall be jointly and severally liable." Approved June 23, 1890.

If section 2 of this act must be construed according to its literal expression, it would give to the fraudulent purchaser of any commodity, e. g. a barrel of flour, the right to recover of the too-confiding dealer any money which he had paid on account, if he could show that he had no intention of performing his bargain by payment of the price as well as by receipt of the goods, and that the dealer had reasonable grounds for believing so, but charitably suppressed his suspicions and granted credit. We cannot believe that the Massachusetts legislature intended thus to place a premium on trover and conversion.

The evident meaning of the act is to affect ostensible contracts of bargin and sale which are not really such ; where one of the parties does not intend that an actual receipt or an actual delivery shall take place and the circumstances are such that a knowledge of such intention may reasonably be imputed to the other party. The intention as to actual receipt or actual delivery is the criterion—the law imputing to the purchaser an intention to pay if he has the intention to receive.

This construction is given to the statute by the Supreme Judicial Court of Massachusetts in *Davy* v. *Bangs*, 174 Mass. 238. That case was brought under the statute to recover the value of stocks which had been deposited with a firm of brokers as collateral security or margin for stock transactions. The plaintiff, for whom one Wiggin acted as agent with the defendants, claimed that she never intended to actually buy or sell and that the brokers had reasonable cause to believe that no intention existed on her part to actually perform the contracts of purchase and sale which formed the transactions in question. The opinion approves the holding of the lower court—that she could not recover if either she or Wiggin intended such performance to be made either by her or by him or by the defendants as her or his

agents; and also the eighth request to rule, as follows: That if the plaintiff intended that the defendants as her agents should receive stocks which she ordered them to buy, delivery to them was delivery to her, and it was immaterial whether she intended to take manual possession of them. The seventh request to rule was as follows: That the transactions would not be within the condemnation of the statute if the plaintiff ordered the defendants to buy and sell securities and the defendants, as her agents, bought and received, sold, and delivered, the securities, although it was agreed that the defendants should hold the stock purchased for her as security for advances made on her account, and should sell them when so ordered by the plaintiff and account to her for the proceeds thereof. Under this request, which was refused by the trial justice, the court say: "Assuming that the seventh request properly states the law, we think it became immaterial upon the rulings and findings of the court." It was also held in this case that it was for the plaintiff to prove both that her intention was not to perform and that the defendants had reasonable cause to believe so. The only other case cited in this connection is *Lyons* v. *Coe*, 59 N. E. Rep. 59, where it was conceded in an agreed statement that the contracts were forbidden by the statute, and the only question was whether the broker could recover from the customer as well as the customer from the broker. The material question, therefore, under the Massachusetts statute is whether or not the defendants intended that the plaintiff's intestate should make actual purchases and sales of stocks on their behalf, and should actually receive and deliver the same; and, if not, whether the plaintiff's intestate had reasonable cause to believe their intention to be such as it was.

The fourth section of the act, which prescribes certain rules of evidence, can only have application in the courts of Massachusetts on the trial of cases brought under the statute. We are only concerned here with the implication of the statute which makes void the contracts it describes; we have nothing to do with the direct provisions which grant a

remedy there to one wrong-doer against another. *Equitable Life Assurance Society* v. *Frommhold*, 75 Ill. App. 43 ; *Scudder* v. *Union National Bank*, 91 U. S. 406 ; Dicey, Conflict of Laws, 711 ; *Brown* v. *Thornton*, 6 A. & E. 185.

The account on Prescott's ledger begins, August 6, 1895, by charging the defendants for one hundred and forty shares of six different stocks at various prices, amounting in all to $10,938.75. A cash payment is credited the same day of $700. On September 4 sixty shares of stock are charged, and on September 17 one hundred and twenty more, amounting together to $11,625 in addition to the August purchases. On September 17 is credited cash, $900 ; and on the 20th, $300 ; and on the 16th, dividend C. B. & Q., $30. The above stocks are carried forward each month, and interest is charged on the last day of each month until December. On November 30 a charge is made of cash, $500. In October the credits are 21st, Div. 90 St. P. $90 ; 29th, cash, $500. In November the credits are 1st, cash, $400, and dividend 60 R. I. $30 ; 6th, cash, $400 ; 20th, Div. 10 Mont. $50.

The December account starts with a debit balance from the previous month $19,996.08, represented by 90 Mo. P., 10 Mont., 10 Tam., 60 C. B. & Q., 90 St. Paul, 60 R. I. The credits are : Dec. 3d, cash, $450 ; 16th, Div. C. B. & Q., $60 ; 20th, cash, $800 ; 23rd, 90 Mo. P., 20¾, $1,856.25 ; 10 Mont., 60, $598.75 ; 10 Tam., 119, $1,187.50 ; 60 C. B. & Q., 72⅜, $4,357.50 ; 50 St. Paul, 62, $3,093.75 ; 60 R. I., 61, $3,652.50 ; 40 St. Paul, 61⅞, $2,470. There is a charge of interest on the 30th of $73.38, and the balance of $1,543.21 is carried forward on the 30th to the 31st. On the 31st are credited Div. 10 Tam., $40, and bills receivable $1,503.21, and the account is balanced.

The journal shows that the items in the ledger were entered from day to day in the regular course of business. The bookkeeper who kept the account had no suspicion that the entries did not represent real transactions. The account appears to be a record of genuine purchases and sales, and belongs to a class of evidence which is given much weight by our court, especially after the party who kept it is dead. It seems to

us quite improbable that dividends would have been credited on all these stocks and shown on the journal as received if the stocks had not been actually purchased. These purchases are claimed to have been made in pursuance of verbal or written orders from the defendants. Some of the written communications are in evidence. August 7, Lincoln writes: "I have not received a regular notice of purchase of stocks for Gorton and Lincoln that you told me had been sent. Please send same so that I can show it to Mr. Gorton." On September 1 he writes again: "Buy for account of Lincoln and Gorton at lowest market price possible, tomorrow, Tuesday morning at opening, 30 St. Paul, 30 No. Pacific." The other orders were, it is admitted, of similar tenor. Another circumstance shown by the account seems to us remarkable if it represented fictitious transactions. The final sale was on December 21, entered on Monday, the 23rd. There were ninety shares of St. Paul sold, fifty at 62 and forty at 61⅞. If the contract had been to close out imaginary stock at market quotations the closing quoted price for the day would have fixed the price for the whole. While considering the question of the genuineness of these dealings, we cannot ignore the fact that the sale of the New York stocks, as most of these were, is corroborated by the books of Prescott's New York correspondent, who was a member of the Exchange and received orders to be executed there, and that his bookkeeper testifies that in some cases the certificates were actually forwarded by Prescott to him. There is absolutely no evidence to contradict the natural inference from these premises, and we must conclude that Prescott, as a matter of fact, actually bought the stocks the defendant ordered him to buy and actually sold, as his books show.

Did the defendants intend that he should do so? Lincoln's testimony on this point is as follows:

"At the time you gave the order to buy it, had you any intention—what was your intention, rather, as to taking the stock and the certificate? A. None whatever.

"What was your intention with reference to taking the

stock or the certificates? A. We had no intention of taking them.

"What was your intention with reference to the account? A. To be carried on a margin and held for a rise.

"How to be settled? A. Pay the difference."

Gorton testifies: "Q. Now with reference to these transactions between F. W. Prescott & Co. and yourself with Mr. Lincoln, did you receive, did you ever take out the certificates, were they ever sent to you or either of you? A. No, sir. Q. Did you ever ask for them? A.' No, sir. Q. What was your expectation or intention at the time you entered into the transaction, as to having a delivery of the stock made to you? A. We never expected to receive any. Q. Were you engaged in the previous transaction with F. W. Prescott & Co.? A. Yes, sir. Q. The same one that Mr. Lincoln referred to in his testimony? A. Yes, sir. Q. When was that settled—the account closed? No answer. Objected to. The Court: What do we care about the previous one? Defendant's counsel: As showing what the expectation of the other party was. Q. Repeated. A. At the difference between our buying price and the selling price of the stock, which was bought on margins. Q. What do you mean by that, 'at the difference?' A. The difference of the day of the sale from the day of buying. Q. You mean that was paid out in money or by check? A. Yes, sir. Q. Did you take the certificates out ever? A. Never. Q. Never ask for them? A. Never. Q. These you expected to be the same way? A. Yes."

When we consider this testimony it becomes evident that it proves nothing to the purpose. If the defendants had ostensibly bought stock of the plaintiff and sold stock to him, then their intention to receive and deliver certificates would have been of importance. But when they directed him to buy for their account the question is, did they intend that he should actually buy and receive the certificates and did they intend that he should deliver certificates when they ordered him to sell? These questions the testimony does not answer.

So in regard to the previous transactions. They say that

these were settled by the payment of "differences." If, as we must presume, in the absence of any contradictory testimony, the former series of transactions consisted of orders to buy and orders to sell, followed by a settlement after sale, we can conceive of no possible method of settlement except by differences, *i. e.*, by the agent paying his principals the balance due on their account. "Where settlements are made between a principal and agent growing out of contracts made by the agent for and on account of the principal, it is apparent that any number of such settlements would have no tendency to prove that the contracts made by the agent were wagers." Dewey on Contracts for Future Delivery, 217, citing *Thacker* v. *Hardy*, L. R. 4 Q. B. D. 685 ; and *Sawyer* v. *Taggart*, 14 Bush. (Ky.) 727, 742.

The defendants urge, and some of the cases which they cite take the view, that the pecuniary inability of the defendants to pay the full price charged for the stocks bought, ought to have great weight in inclining the court to believe that the intention was not to buy but to fix a starting-point for a wager. We do not find any force in this argument, particularly when the purchase is made through a broker and the purchaser avails himself of the broker's credit and facilities for borrowing on the stocks themselves. It only indicates at the most that the customer is buying for speculation rather than for permanent investment. Says Mr. Dewey, Contracts for Future Delivery, 129 : "The argument is so strongly urged in these cases that the party dealing in such enormous amounts is not able to pay for them, is without force, and has no necessary tendency to show the contracts were not *bona fide*. . . . These cases seem to have proceeded upon the theory that because a man could not buy or pay for the articles he dealt in he did not intend his contracts to be *bona fide*. When we consider, however, that a party buying stocks, for instance, can immediately, without any trouble and at a small interest borrow money up to within ten per cent. or even less of the value of the stocks, . . . it plainly appears that the force of this argument is broken. To say a man cannot buy what he is not able to pay for, is to

destroy the whole credit system, and in effect it would prevent the greater part of legitimate speculation and paralyze business."

In the case at bar the broker bought stocks for the defendants, advancing on their account part of the price, holding the stock as security or pledging it perhaps to a third party to raise the money, as he was permitted to do by the contract. Of course the principals could not demand or expect to receive the certificates until they should pay the whole price advanced, and before they did so they ordered sales. When these sales were made the money which came into the agent's hands was partly his and partly theirs, and he paid them what was theirs.

In short, the statute deals with two classes of cases—one where the party himself buys and sells; the other where he employs another to buy and sell. When he himself buys and sells, his intention to take and deliver is important; when he employs another to buy and sell, his intention as to what the agent shall do is material. The testimony which the defendants have given here would be pertinent in the first case, but has no relevancy to the second, which is the case at bar. *Thacker* v. *Hardy, supra.* Neither defendant, though strenuously invited by the questions of his learned counsel, makes the plain statement, so easy to make if it were true, that the former differences were not determined by actual purchases and sales. It is doubtless true that the selling price was identical with the quoted price, for actual sales on the Exchange are immediately reported, and these reports are "quotations." And that is all that the testimony of either defendant amounts to. If they had not intended their orders to Prescott to be carried out according to their terms, one would expect them to have given him some notice of that fact when they received accounts of purchases and monthly statements, including charges of interest and credits of dividends. He very clearly thought and had reason to believe that the orders were made in good faith. The defendants have failed to establish either fact required by the Massachusetts statute.

The question remains whether these transactions were wagering-contracts, such as are held by the common law to be contrary to public policy and which cannot therefore be considered a valid consideration for a promise sued upon in any court where the common law prevails.

(4)    Wagering-contracts in general were formerly enforcible at common law; but by statute in England, and either by statute or by the general agreement of the decisions of the courts in the United States, they are now held to be void and non-enforcible.    In Rhode Island we have no statute condemning such contracts generally, but gambling and the making of many sorts of bets and wagers are made misdemeanors by statute, and the spirit of these laws makes it clear that in the opinion of the legislature public policy forbids the enforcement of all wagers by our courts, and it has been so held by this court.    *Flagg* v. *Gilpin,* 17 R. I. 10.

"A bet or a wager is ordinarily an agreement between two or more that a sum of money or some valuable thing, in contributing which all agreeing to take part, shall become the property of one or some of them, on the happening in the future of an event at the present uncertain, or upon the ascertainment of a fact in dispute." 4 Am. Ency. of L. 2 Ed. 5; *Harris* v. *White,* 81 N. Y. 539.    This definition, though not exhaustive, sufficiently expresses what is meant by a wager.

The essential elements of an ordinary wagering-contract are: 1st, an agreement by one party to pay another a sum of money or give something of value if a certain event happens; and, 2nd, a reciprocal agreement by the second party to pay the first a sum of money or give something of value if a certain contrary event happens; and, 3rd, that the events contemplated in the agreement shall be something other than the passing of a consideration between the parties.

In a wagering-contract upon the price of stocks, both parties assume the risk of gaining or losing.    In a legitimate transaction through an agent or broker, the agent or broker assumes no risk except that the principal may not be able to carry out his agreement.    His compensation is derived from commissions on actual purchases and sales and from interest

on money actually lent. The sole question in this, as in similar cases, is as to which class the transaction belongs. Nor should it be forgotten that the mere intention of either of the parties in entering into the contract, if not communicated to the other and made part of the bargain, is not the controlling circumstance to be considered. The question is not whether the parties privately intended to enforce the agreement or to fulfill it, but what did they bind themselves to do? This is well stated in *Harvey* v. *Merrill*, 150 Mass. 1, 6, as follows:

"If, however, it is agreed by the parties that the contract shall be performed according to its terms, if either party requires it, and that either party shall have a right to require it, the contract does not becoming a wagering-contract because one or both of the parties intend, when the time for performance arrives, not to require performance but to substitute therefor a settlement by the payment of the difference between the contract price and the market price at that time. Such an intention is immaterial except so far as it is made a part of the contract, although it need not be made expressly a part of the contract."

When a mortgage is made to a savings bank to secure the payment of a promissory note in one year, as is customary in this State, it is rarely the intention of the mortgagor to pay the note according to its terms or of the bank to enforce payment at the end of the year. Yet the obligation is enforcible, according to the tenor of it, the intention of the parties to insist upon or to waive their rights being no part or condition of the agreement which they have consented to. See also *Gregory* v. *Wendell*, 40 Mich. 432 ; *Irwin* v. *Williar*, 110 U. S. 507 ; Dos Passos on Stockbrokers, etc., 419 ; *Lehman* v. *Strassberger*, 2 Wood Cir. Ct. 554.

(5) It is not unlawful to buy stocks with the intention of selling again at a profit, nor to do this through a broker, nor to allow the broker to hypothecate the stock in the meantime to raise part of the purchase-money. The law does require that the stock should be in existence and that the customer should acquire such control by the purchase as to be able to deliver

the title to it if called for when he sells. It makes no differ-
ence whether the certificates are delivered to the customer if
his agent, the broker, acquires dominion over them. *Young
v. Glendenning*, 45 Atl. Rep. 364.

The bargain must contemplate the actual delivery, if
desired, and the actual payment of the whole price, if de-
manded. It must confer on the purchaser the right to have
the stock transferred to him on payment for it. If it does it
is a purchase whether the stock is actually transferred to him
or not. It is as lawful for a purchaser to pay a certain
agreed amount on account of a purchase of stock as it is for
a purchaser of real estate to make a partial payment and to
secure the balance by a mortgage to the vendor.

If the agreement between the parties does not contemplate
an actual purchase, but merely a payment by one party to
the other or by the ostensible purchaser to his broker, if
the stocks decrease in market value, and a payment by the
broker to his customer if the price rises in the market, then
no matter what form the transaction is put in, verbally or in
writing, it is merely a wager on the fluctuation of market
values and not enforcible at law.

A transaction of the former case appears in the case of
*Hatch v. Douglas*, 48 Conn. 116. The plaintiffs were stock-
brokers in the city of New York. The defendant ordered
them "to buy say 100 shares Union Pacific stock on margin,"
and asked if the brokers would take "1,000 first mortgage
New York and Oswego Railroad as margin." The brokers
replied that they would, and at once bought the stock.
Other transactions were entered into which resulted in a loss
exceeding the value of the security held. This suit was
brought for the balance due. Recovery was allowed. The
court in its opinion says:

"Now there are in the transactions between these parties
some of the elements which are usually found in a gaming
contract. For instance, it is pretty evident that the parties
did not contemplate that the stock should be actually trans-
ferred to the defendant, but he would have been satisfied with
the receipt of the difference between the price received, less

interest and commissions, if the price advanced, and expected to pay that difference if the price declined. To that extent it was a contract for the payment of the difference. But it was more than that. The defendant through his agents, the plaintiffs, actually purchased the stock, and there was an actual delivery—not to the principal, but to the agents for the principal. . . . The most that can be said of them is, that they knew that the defendant was speculating, and that they advanced him money for that purpose. But that was neither illegal nor immoral."

There is a distinction between the two meanings of the word "differences." To contract with reference to the difference between market values without making actual purchases is wagering ; but to buy at one price and sell at another, or, in the alternative, to accept or pay the difference between prices actually paid and received by an agent, is a valid transaction.

In *Ward* v. *Vosberg*, 31 Fed. Rep. 12, it is said, page 13 : "It has been of late repeatedly decided that if the parties intend in fact to buy or sell property to be delivered at a future time agreed upon by them, it is not a gambling transaction, although they exercise the option of settling the difference in price rather than make delivery of the property."

The latter class of the two we are considering is illustrated by the case of *Flagg* v. *Gilpin, supra*. The court say : "The case alleged in the pleas is one where it was the understanding of the parties in the beginning that the defendant should give orders to the plaintiff, as broker, from time to time to buy for him shares of stock, and that the plaintiff, on receiving the orders, without buying the shares should be regarded as having bought them, and as holding them for the defendant until he should receive the defendant's order or consent to sell them, or until the defendant under the understanding should be obliged to submit to his selling them, or rather to his being regarded as if he had sold them, at which time the difference between the then market price and the market price as it was when the orders to buy were given

should be paid by the plaintiff to the defendant if the price had risen, and by the defendant to the plaintiff if it had fallen." In this case there was no evidence presented, the case coming up on demurrer to the pleas which were thus taken to be true. They presented an unmistakable wagering-contract, and the court decided that such a contract is void in Rhode Island.

The rapid fluctuations in the market price of stocks and the ease with which transfers and hypothecations of stocks may be made, render them a favorite subject for speculation, either legitimate or otherwise ; and where there is suspicion that a given transaction in stocks is only cover for a wager, a court will very carefully scrutinize the circumstances of the case, and disregard the form if the illegal substance appears. But the *indicia* of a wager upon the rise and fall in the price of stocks are no different from those of wagers upon any uncertain future event. And so lawful trading in stocks has the same characteristics as lawful trading in any commodity. Mitchell, J., in *Hopkins* v. *O'Kane*, 32 Atl. Rep. 421 (1895), says:

"It ought not to be necessary to say again after *Peters* v. *Grim*, 149 Pa. St. 163, that a purchase of stocks on margin is not necessarily a gambling transaction. Stocks may be bought on credit, just as flour, or sugar, or anything else ; and the credit may be for the whole price or for a part of it, and with security or without. 'Margin' is security, nothing more ; and the only difference between stocks and other commodities is that as stocks are more commonly made the vehicle of gambling speculation than some other things, courts are disposed to look more closely into stock transactions, to ascertain their true character. If they are real purchases and sales they are not gambling, though they are done partly or wholly on credit."

In the cases cited by the defendants we find nothing to invalidate the propositions of law which we have recognized.

In *Grizewood* v. *Blane*, 11 C. B. 526, 540, the court found in the words of Mr. Justice Williams that there was ample

evidence of a mutual understanding between the plaintiff and defendant that the contract of sale was colorable only.

In *Wagner* v. *Hildebrand*, 187 Pa. St. 136, 141, the court says : " A purchase of stock on margin for speculation is not necessarily a gambling transaction. If it is the intention of the parties that a real purchase shall be made by the broker, although the delivery may be postponed or made to depend upon future conditions, the transaction is legal," etc. The court found in the case that no actual purchase and sales were intended.

*Irwin* v. *Williar, supra,* holds that contracts for future delivery are valid, though the seller has not the goods at the time of the contract, if the parties intend actual delivery and receipt and not a settlement by payment of the difference between the contract price and the market price. The case is decided on grounds not applicable to the case at bar.

*Rogers* v. *Marriott* (Neb.), 82 N. W. Rep. 21, relates to sales for future delivery, and the same discrimination is drawn between deliveries intended actually to be made and mere intended payments of differences.

*Morris* v. *W. U. Tel. Co.* (Me.), 47 Atl. Rep. 926, is a case where the contract was expressed in scrupulously legal form ; but it was admitted "that in such a transaction or deal the method of business in the plaintiff's deal is as follows : "Such deals are made on quotations only, no actual stock being in fact sold ; but settlements of differences are fully made when the deals are closed as to profits and losses." "This admission," says the court, "is fatal to the plaintiff's case. It strips the transaction of the semblance of legitimate business with which the memorandum endeavored to clothe it, and leaves it a naked bet or wager upon the rise and fall of the price of the stock, which the law terms a gambling contract and pronounces immoral and void."

*Waite* v. *Frank* (S. D.), 86 N. W. Rep. 645, was a case of sale for future delivery. The same indications of a wagering-contract were discovered as in the cases already referred to.

In *Jamieson* v. *Wallace*, 167 Ill. 388, the opinion begins by recognizing the well-settled proposition that when the

understanding of the parties is that a nominal contract of purchase and sale shall be in reality an agreement of settlement by payment of differences between market prices, the contract is a wager and is void; and continues: "In order to invalidate the contract it must appear that neither party has the intention to deliver the property, and that both parties have the intention of settling the differences only." But the opinion ends by holding that under the Criminal Code of Illinois, section 130, which positively forbids all sales of options, the intent of the customer and the broker alone is material, and it makes no difference if the broker actually purchases the stock.

This may be so under the Illinois statute, but is opposed to the great weight of authority when the question of the validity of a transaction between a broker and his customer is judged by the common law.

If we regard the customer and the broker as principals, the real question is not whether the customer secretly intends to receive the stock, but whether he intends to bind himself to receive it; and if we regard the broker as an agent, as he certainly is in buying, we must examine his acts and contracts as such agent. *Barnes* v. *Smith*, 159 Mass. 344.

Where the transaction is on its face a genuine one, the burden of proof is upon the party attacking it to show its falsity. *Bangs* v. *Hornick*, 30 Fed. Rep. 97. In this case Mr. Justice Brewer says:

(6)    "If the deposition of Lester was properly admitted, an actual *bona fide* transaction was proven; if it was improperly admitted, there is no testimony to show any wrong on the part of Lester & Company, and the law does not presume a wrong. Counsel for defendant say that it is the absolute duty of the court to denounce this transaction, unless it clearly appears that it was a valid and honest one. I think the duty of the court is precisely the reverse, and that it is the duty of the court to uphold it unless it appears that it was an invalid and dishonest one. The defendant has given his note. The law presumes that there was a consideration,

and an honest one, and, unless he has shown the contrary, he should abide by the contract he has made.

"Further, this is not a case where defendant, as principal on the one side, was dealing with Lester & Company as principal on the other. There was no contract of purchase or sale, real or pretended, between them. They were simply brokers, agents to do his bidding in transactions, real or pretended, elsewhere. There is no presumption that an agent does not obey them ; and, it matters not what the intent or supposition of the principal may be, the law will presume that the agent obeyed the instructions that were given and as they were given ; and if the contrary be alleged it must be proved."

The many reported decisions on cases relating to this subject differ slightly in the fundamental principles announced, but mainly in the inferences of fact which the courts have drawn from the evidence before them.

In the case at bar it is not necessary to recapitulate the evidence to support our conclusion that the transactions on which the note was based were actual purchases and sales made by the broker in good faith upon orders given by the defendants with the intention that they should be executed. No case has been cited to us and we have found none where, these facts being established, the obligation has not been adjudged binding.

Judgment for plaintiff for the amount of the note with interest from November 7, 1898, the date of the writ.

*Edwards & Angell*, for plaintiff.

*Van Slyck & Mumford*, for defendants.