Western Reserve Life Assurance Co. of Ohio   :

v.                              :

ADM Associates, LLC.                  :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Western Reserve Life Assurance Co. of Ohio   :

v.           :

ADM Associates, LLC.       :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** A rapacious investment scheme exploiting the complexities of certain variable annuity policies provides the context for two questions certified to this Court by the United States Court of Appeals for the First Circuit (First Circuit) pursuant to Article I, Rule 6 of the Supreme Court Rules of Appellate Procedure. The first question asks whether an "annuity [is] infirm for want of an insurable interest" when "the owner and beneficiary of an annuity with a death benefit is a stranger to the annuitant * * *?" The second question inquires whether "a clause in an annuity that purports to make the annuity incontestable from the date of its issuance preclude[s] the maintenance of an action based on the lack of an insurable interest?" For the reasons set forth herein, we answer the first question in the negative and the second question in the affirmative.

**I**

**Facts and Procedural History**

Although we have only been asked to consider two general questions of law, a brief summary of the underlying civil action will help provide the factual predicate for these intriguing legal issues. The facts set forth below are drawn from the opinions published by the First Circuit

- 1 -

and the United States District Court for the District of Rhode Island (District Court). See Western Reserve Life Assurance Co. of Ohio v. ADM Associates, LLC, 737 F.3d 135, 136-39 (1st Cir. 2013); Western Reserve Life Assurance Co. of Ohio v. Conreal LLC, 715 F. Supp.2d 270, 273-75 (D.R.I. 2010) on reconsideration in part sub nom., Western Reserve Life Assurance Co. of Ohio v. Caramadre, 847 F. Supp.2d 329 (D.R.I. 2012).[1]

Joseph Caramadre was an attorney who specialized in finding loopholes in insurance and annuity products that would be personally lucrative to him. One of his investment ideas involved taking advantage of both the application process and structure of variable annuity policies designed and sold by Western Reserve Life Assurance Company of Ohio (plaintiff or Western Reserve). Under plaintiff's "Freedom Premier III" annuity policy, the investor (also known as the policy's "owner") pays the premiums for the policy, directs how the premiums are to be invested, and chooses to whom the periodic annuity payments are to be made. The measuring tool for the policy is the life of the annuitant, who is also selected by the investor. In addition, the investor can elect to purchase the "Double Enhanced Death Benefit." This death benefit guarantees that, upon the annuitant's death, the beneficiary will receive the greater of (1) the highest market value of the policy at a specified anniversary date or (2) a return of all of the premiums paid into the policy plus five percent per annum interest.

Caramadre seized upon the features of plaintiff's variable annuity policy and contrived to mine its vast investment potential. By purchasing the death benefit rider, an investor was virtually assured of a risk-free investment. The investor could direct that his premiums be

---

[1] Since the First Circuit's certification is predicated on an appeal from the dismissal of plaintiff's complaint for failure to state claims upon which relief could be granted, the facts summarized are those alleged in the complaint. See Western Reserve Life Assurance Co. of Ohio v. Conreal LLC, 715 F. Supp.2d 270, 275 (D.R.I. 2010) on reconsideration in part sub nom., Western Reserve Life Assurance Co. of Ohio v. Caramadre, 847 F. Supp.2d 329 (D.R.I. 2012).

invested in speculative securities, name himself as beneficiary, and thus be assured that he would receive no less than the total premiums invested, plus five percent annual interest, upon the death of the annuitant. On the other hand, such risky investments also held the possibility of very substantial profits. Moreover, as Caramadre apparently realized, the shorter the life of the annuitant, the greater the potential for profits.

The macabre sine qua non of the investment strategy, therefore, was the recruitment of terminally ill individuals as annuitants. To implement the scheme, Caramadre and his associates circulated flyers to hospice patients and churches, describing a "Program for the Terminally Ill" wherein hospice patients would receive a cash payment in exchange for their willingness to be designated as the annuitant. Charles Buckman served as the annuitant on the policy that is the subject of the case currently pending in the First Circuit (Buckman policy); a role for which he was paid a total of $5,000. The defendant, ADM Associates, LLC (ADM), "a Caramadre nominee," was designated as the owner and beneficiary of the annuity. No relationship existed between Buckman and ADM prior to the application for the Buckman policy. The defendant initially invested $250,000 as a premium to initiate the Buckman policy, and it specifically requested the Double Enhanced Death Benefit. Soon thereafter, it invested $750,000 as an additional premium payment. The plaintiff issued the policy, which included a clause that the policy would be "incontestable from the Policy Date." Caramadre repeated this process many times over several years using plaintiff's variable annuity policies and a variety of terminally ill individuals, brokerage companies, and their agents. The plaintiff attempted to rescind the Buckman policy one year subsequent to its issuance, after learning that this policy was likely one of the many orchestrated by Caramadre.

The plaintiff filed five separate suits in the District Court against an array of defendants, including Caramadre and one of his associates, the annuity brokerage companies that sold plaintiff's annuity policies, individual agents of these brokerage firms, individual annuitants, and the individual or corporate policy-investors/owners/beneficiaries. Relevant to the appeal currently pending in the First Circuit, plaintiff sought several forms of relief against ADM, including rescission of the annuity policy or a declaratory judgment that the policy was void because ADM lacked an insurable interest in Buckman, as well as monetary damages for fraud, civil liability for crimes and offenses, and civil conspiracy.

All defendants moved to dismiss the complaints for failure to state claims upon which relief could be granted. Two of the central arguments in support of these motions—that the insurable interest requirement for life insurance policies was not applicable to annuities and that the incontestability clauses in the annuity policies precluded plaintiff from litigating any of its claims—form the basis of the certified questions of law now before this Court. The District Court dismissed plaintiff's claims against ADM, concluding that insurance and annuities are separate, distinct financial investment vehicles and that the lack of an insurable interest by ADM in Buckman did not render the Buckman policy void pursuant to Rhode Island law. The District Court also concluded that the incontestability clause in the policy—that the policy "'shall be incontestable from the Policy Date'"—was not in contravention of public policy and "serve[d] to deflect claims to rescind the annuities or have them declared void because of fraud." Conreal LLC, 715 F. Supp.2d at 279, 280.

The plaintiff appealed the District Court's dismissal of its amended complaint to the First Circuit.[2] A panel from the First Circuit determined that "[t]he outcome of th[e] appeal [was] controlled by important questions of Rhode Island law and public policy as to which [they had] found no dispositive precedent." ADM Associates, LLC, 737 F.3d at 136. Consequently, the First Circuit certified two questions of law to this Court, and we accepted these questions pursuant to the discretionary authority provided to us in Rule 6(a).

## II

### Standard of Review

"Rule 6 authorizes this Court to answer questions of law certified to it by any federal court * * *." In re Tetreault, 11 A.3d 635, 638-39 (R.I. 2011). Rule 6(a) provides, in pertinent part, that:

> "This Court may answer questions of law certified to it by * * * a Court of Appeals of the United States * * * when requested by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of this Court."

After we decide to accept questions of law certified to us by one of the courts identified in Rule 6(a), we review these questions de novo. In re Tetreault, 11 A.3d at 639.

The questions presently certified require us to consider both long-standing common law as well as more recently enacted statutory authority. "This Court reviews questions of statutory

---

[2] Prior to the appeal, plaintiff amended its complaints; defendant moved to dismiss the newly added claims for failure to state claims upon which relief could be granted and also moved for reconsideration on the counts that had survived the initial motion to dismiss. Western Reserve Life Assurance Co. of Ohio v. Caramadre, 847 F. Supp.2d 329, 333 (D.R.I. 2012). The District Court dismissed some of the newly added counts and "reaffirm[ed] the dismissal of all claims previously dismissed but not discussed" in its second opinion (i.e., the claims against ADM). Id. at 349-50.

construction and interpretation de novo." Hough v. McKiernan, 108 A.3d 1030, 1035 (R.I. 2015) (quoting National Refrigeration, Inc. v. Capital Properties, Inc., 88 A.3d 1150, 1156 (R.I. 2014)). "It is well settled that, '[w]hen the statutory language is clear and unambiguous, we give the words their plain and ordinary meaning.'" Id. (quoting National Refrigeration, Inc., 88 A.3d at 1156). "The plain meaning approach, however, is not the equivalent of myopic literalism, and it is entirely proper for us to look to the sense and meaning fairly deducible from the context." National Refrigeration, Inc., 88 A.3d at 1156 (quoting Peloquin v. Haven Health Center of Greenville, LLC, 61 A.3d 419, 425 (R.I. 2013)). "Therefore we must consider the entire statute as a whole; individual sections must be considered in the context of the entire statutory scheme, not as if each section were independent of all other sections." Id. (quoting Peloquin, 61 A.3d at 425). However, "under no circumstances will this Court construe a statute to reach an absurd result." Id. (quoting Peloquin, 61 A.3d at 425).

## III

## Discussion

## A

## Question 1

<u>"If the owner and beneficiary of an annuity with a death benefit is a stranger to the annuitant, is the annuity infirm for want of an insurable interest?"</u>

This question requires us to consider whether the "insurable interest requirement"—that a beneficiary of a life insurance policy must have an insurable interest in the individual insured by the policy—applies to an annuity policy with a death benefit. The plaintiff contends that, pursuant to both common law and statutory law, a variable annuity policy with a death benefit is void ab initio if the policy's beneficiary does not have an insurable interest in the annuitant. The

- 6 -

plaintiff asserts that the statutory provision codifying the insurable interest requirement applies to its variable annuity policy with a death benefit because this kind of policy should be considered an insurance policy within the meaning of the statute.

The defendant advocates contrariwise, contending that the variable annuity policy with a death benefit is both "structurally and functionally different from life insurance" and therefore is not subject to either the common law or the statutory insurable interest requirement that applies to life insurance policies. The defendant argues that these investment vehicles are treated differently under the law, as evidenced by Rhode Island's treatment of annuities at common law as different from life insurance, as well as the way in which the applicable statutes define each kind of policy separately. The defendant also argues that the statutory insurable interest requirement applies only to insurance contracts, and that to apply the statutory insurable interest requirement to annuities would be counter to the statute's express language.[3]

We establish at the outset that we consider an annuity policy with an elective death benefit to be separate and distinct from a life insurance policy. The General Assembly defines annuities as "all agreements to make periodic payments for a certain period or where the making or continuance of all or some of a series of the payments, or the amount of any payment, depends on the continuance of human life, except payments made in connection with a life insurance policy." G.L. 1956 § 27-4-0.1(a) (emphasis added). Life insurance is defined in § 27-4-0.1(c),

---

[3] We thank Fortune Financial Services, Inc. and The American Council of Life Insurers (ACLI), organizations to which we granted leave to file briefs as amicus curiae, for their insights on the legal issues presented to us in the certified questions. Fortune Financial Services, Inc., an annuity brokerage company, is one of the named defendants in one of the other cases that plaintiff filed in the United States District Court for the District of Rhode Island. See Conreal LLC, 715 F. Supp.2d at 270, 274. The ACLI is a nonprofit corporation that represents 284 companies that are "actively working in public policy forums to combat a growing practice of using financial products as mere wagers."

which does not make any mention of annuities.[4]  Furthermore, the structure of plaintiff's variable annuity policy is significantly different from that of a life insurance policy.  With plaintiff's variable annuity policy, the investor agrees to pay the company issuing the policy a certain premium in exchange for the company's agreement to periodically pay the policy's beneficiary a sum of money as long as the annuitant is alive. See ADM Associates, LLC, 737 F.3d at 137.  If the investor elects to include the death benefit as part of the policy, then the investor pays an additional daily fee. Id.  The advantage of electing the death benefit is that the investor's base-level investment is protected.  Essentially, the investment is guaranteed not to result in a loss to the investor because, when the annuitant dies, the beneficiary (here, the same entity as the investor) will receive at least a return of the premiums that it paid into the policy plus interest, and at most a return from a profitable investment decision. See id.  Conversely, a life insurance policy provides for a guaranteed, set sum upon the death of the insured.  The purpose behind the life insurance policy is to provide a benefit to a beneficiary or beneficiaries only upon the death of the insured.  On the other hand, an annuity policy provides for periodic payments during the life of an annuitant, subject to various contractual provisions. Id. at 136.  The elected death

---

[4] General Laws 1956 § 27-4-0.1(c) defines life insurance in pertinent part as:

> "every insurance upon the lives of human beings and every insurance appertaining to that life, including the granting of endowment benefits, additional benefits in the event of death by accident, additional benefits to safeguard the contract from lapse, accelerated payments of part or all of the death benefit, or a special surrender value upon diagnosis of terminal illness, defined as a life expectancy of twelve (12) months or less, or of a medical condition requiring extraordinary medical care or treatment regardless of life expectancy, or a special surrender value upon total and permanent disability of the insured, and optional modes of settlement of proceeds."

benefit simply protects the investment against loss, allowing the investor to more safely choose to invest the premiums in higher-risk securities. Id.

The insurable interest requirement for life insurance policies has long been settled in Rhode Island's common law and statutory law: The beneficiary of a life insurance policy must have an insurable interest in the life of the insured. Section 27-4-27(a); Cronin v. Vermont Life Insurance Co., 20 R.I. 570, 571, 40 A. 497, 497 (1898). This Court defined "insurable interest" at common law as:

> "arising from the relations of the party obtaining the insurance, either as creditor of or surety for the assured, or from the ties of blood or marriage to him, as will justify a reasonable expectation of advantage or benefit from the continuance of his life." Cronin, 20 R.I. at 572, 40 A. at 497 (quoting Warnock v. Davis, 104 U.S. (14 Otto) 775, 779 (1881)).

In 1990, the General Assembly codified the definition of an "insurable interest" in § 27-4-27(c), as enacted by P.L. 1990, ch. 263, § 1.

> "'Insurable interest' as to personal insurance means that every individual has an insurable interest in the life, body, and health of himself or herself and of other persons as follows:
> "(1) In the case of individuals related closely by blood or by law, a substantial interest engendered by love and affection;
> "(2) In the case of other persons, a lawful and substantial economic interest in having the life, health, or bodily safety of the individual insured continue, as distinguished from an interest which would arise only by, or would be enhanced in value by the death, disablement, or injury of the individual insured."

Section 27-4-27(a) sets forth the statutory insurable interest requirement:

> "No person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under the contract are payable to the individual insured or his or her personal representatives, or to a person having, at the time when the contract was made, an insurable interest in the individual insured."

This statutory requirement has colonial roots that extend across the Atlantic Ocean to England, where purchasing a life insurance policy on the life of another person for whom the policy beneficiary had no interest was prohibited as early as 1774. See Cronin, 20 R.I. at 571, 40 A. at 497. The common law of this state has long held that, "upon principle, a purely speculative contract on the life of another is * * * objectionable on the grounds of public policy * * * and such a contract may properly be held to be void." Id. at 572, 40 A. at 497. Speculative contracts upon human life have long been prohibited as a matter of public policy because to wager on human life is to provide an incentive to shorten the human life wagered upon. See Grigsby v. Russell, 222 U.S. 149, 154 (1911) ("A contract of insurance upon a life in which the insured has no interest is a pure wager that gives the insured a sinister counter interest in having the life come to an end.").

Whether this insurable interest requirement should be extended to annuity policies is a matter of first impression for this Court. Long before the General Assembly enacted § 27-4-27 in 1990, we commented that the absence of an insurable interest would not render an annuity void as a matter of public policy despite the "element of chance" encompassed by an annuity policy. Cronin, 20 R.I. at 572, 40 A. at 497. However, the structure of annuity policies has become increasingly complex since our comment in Cronin; variable annuity policies have evolved to offer a variety of elective features, including a smorgasbord of investment and payout options, as well as death benefits. ADM Associates, LLC, 737 F.3d at 136-37. But the common law has not yet been extended to cover annuity policies on the grounds of public policy, and, in our opinion, § 27-4-27 is unambiguous in its sole application to life insurance policies. Title 27 of the General Laws is broadly entitled "Insurance," and chapter 4 comprises "Life Insurance Policies and Reserves." We are not convinced by plaintiff's contention that the language in

- 10 -

§ 27-4-27(a) referring to "any insurance contract" should be construed to cover a variable annuity with a death benefit. In our opinion, the plain text of § 27-4-27(a) clearly indicates that the insurable interest requirement applies to life insurance only, as the phrase "any insurance contract upon the life or body of another individual" is synonymous with "life insurance."

Moreover, a review of chapter 4 of title 27 in its entirety reveals that the General Assembly contemplated annuities in some sections of this chapter that governs life insurance policies, but not in others. In the other sections within chapter 4 that mention annuities, the language expressly includes annuities within each of the sections by the use of phrases such as "life insurance and/or annuities" and "all life insurance policy forms and annuity contract forms" in § 27-4-24, "life insurance contract or annuity contract" in § 27-4-26, "[a]ny policy of life or endowment insurance or any annuity contract" in § 27-4-12, and "[e]very individual life insurance policy delivered * * * and every individual annuity contract delivered" in § 27-4-6.1. We therefore conclude that, if the General Assembly intended the insurable interest requirement in § 27-4-27(a) to apply to annuity policies as well as to life insurance policies, then the Legislature would have expressly so indicated within the language of this section. See National Refrigeration, Inc., 88 A.3d at 1156 (stating that "we must consider the entire statute as a whole; individual sections must be considered in the context of the entire statutory scheme, not as if each section were independent of all other sections"); Rhode Island Dairy Queen, Inc. v. Burke, 101 R.I. 644, 647, 226 A.2d 420, 422 (1967) ("If the [L]egislature wished to include in the statute cases of the instant description, it would have said so."). For this Court to declare that § 27-4-27(a) applies to annuity policies "would strain the clear and unambiguous language thereof and would violate well-established rules of statutory construction." Rhode Island Dairy Queen, Inc., 101 R.I. at 647, 226 A.2d at 422.

The plaintiff also contends that the insurable interest required by § 27-4-27(a) applies to annuity policies "indirectly" through G.L. 1956 § 27-32-8. Chapter 32 of title 27 governs "Pension, Profit Sharing or Annuity Plans." Section 27-32-1(a) authorizes life insurance companies to "establish one or more separate accounts, and may allocate to the account or accounts any amounts paid to it which are to be applied under the terms of an * * * agreement to provide annuity or life insurance benefits, * * * payable in fixed or in variable dollar amounts or in both." Section 27-32-8 states that "[e]xcept as otherwise provided in this chapter, all pertinent provisions of the insurance laws of this state shall apply to separate accounts and agreements relating to them." Since § 27-32-8's broad mandate directing attention to "all pertinent provisions of the insurance laws" does not provide any guidance as to which insurance laws would be pertinent to "separate accounts and agreements relating [thereto]," we must consider § 27-32-8 in the context of the "insurance laws" within title 27.

As discussed supra, the "insurance laws" within chapter 4 of title 27 that govern "Life Insurance Policies and Reserves" either explicitly include annuity policies within the individual section, or do not pertain to annuity policies because the individual section refers explicitly to life insurance policies only. Since the General Assembly only included express language relating to annuity policies in some of the sections in chapter 4 of title 27, those sections that explicitly refer to annuity policies are the "pertinent provisions of the insurance laws" to which § 27-32-8 refers. Since § 27-4-27(a) does not explicitly include annuity policies, this section is not one of the pertinent provisions that apply to "Pension, Profit Sharing, or Annuity Plans," and is therefore not indirectly applicable to annuity policies through § 27-32-8.

The Life Settlements Act (LSA), enacted in 2009 (P.L. 2009, ch. 195, § 1), also has a role in this discussion. See G.L. 1956 chapter 72 of title 27. The LSA regulates the industry whereby

- 12 -

life insurance policyholders sell their existing life insurance policies to a stranger in exchange for receiving cash payments during their lifetime. See id. Relevant to the certified question before us is that the LSA expressly prohibits stranger-originated life insurance policies (STOLIs). Section 27-72-2(9)(A)(X). A STOLI is defined in § 27-72-2(26) as "a practice or plan to initiate a life insurance policy for the benefit of a third-party investor who, at the time of policy origination, has no insurable interest in the insured." However, the LSA does not mention annuities at all. See chapter 72 of title 27. The plaintiff argues that the LSA was simply enacted before the General Assembly was aware of Caramadre's "stranger-originated annuity transactions" (STATs) and that STATs are prohibited "for all the reasons that STOLIs [are] prohibited." The defendant counters that the LSA was clearly intended to only cover STOLIs because it does not refer to STATs at all. A review of the LSA reveals that it clearly and unambiguously prohibits STOLIs and is silent as to annuities and STATs. "When the Legislature has spoken clearly, this Court will not infer a contrary result." Pierce v. Pierce, 770 A.2d 867, 872 (R.I. 2001). Furthermore, "[i]t is not the function of this [C]ourt to rewrite or to amend statutes enacted by the General Assembly." Id. (quoting Rhode Island Federation of Teachers, AFT, AFL-CIO v. Sundlun, 595 A.2d 799, 802 (R.I. 1991)); see also Simeone v. Charron, 762 A.2d 442, 448-49 (R.I. 2000) ("[T]his Court will not broaden statutory provisions by judicial interpretation unless such interpretation is necessary and appropriate in carrying out the clear intent or defining the terms of the statute.").

While it is our opinion that the insurable interest requirement, as codified in § 27-4-27, does not apply to an annuity policy with a death benefit, we must also consider whether this kind of annuity, absent an insurable interest, can be classified as a wagering contract and therefore considered void as a matter of public policy. The plaintiff argues that the absence of an insurable

- 13 -

interest renders the policy void because this absence "transforms the agreement into a wagering contract speculating upon the life of a stranger, with the beneficiary profiting upon that stranger's demise." The plaintiff further argues that "[t]he public policy considerations that support the common law insurable interest requirement compel its application to contracts that provide a financial incentive for a stranger beneficiary to terminate a person's life prematurely." The defendant counterargues that the policy's "death benefit is not insurance on the life of any person, but a contract measure of the value of the investment by the annuity's owner, which [plaintiff] has obligated itself to pay upon the annuitant's death." The defendant acknowledges the policy that supports the insurable interest requirement, but asserts that plaintiff's variable annuity policy with a death benefit does not present the same risk because the structure of this annuity protects only the value of the policy owner's investments. The defendant recommends that plaintiff "avail [itself] of the legislative process" if it wants the insurable interest requirement to apply to annuities as well as to life insurance contracts.

As stated supra, "a purely speculative contract on the life of another is * * * objectionable on the grounds of public policy * * * and such a contract may properly be held to be void." Cronin, 20 R.I. at 572, 40 A. at 497. The well-established elements of a wagering contract include:

> "(1) an agreement by one party to pay another a sum of money, or give something of value, if a certain event happens; (2) a reciprocal agreement by the second party to pay the first a sum of money, or give something of value, if a certain contrary event happens; and (3) that the events contemplated in the agreement shall be something other than the passing of a consideration between the parties." Winward v. Lincoln, 23 R.I. 476, 492, 51 A. 106, 112 (1902).

It is our opinion that the investor/beneficiary's lack of an insurable interest in the annuitant does not convert this investment into a wagering contract because the investor's payment of the

premium does not depend on the occurrence of a certain event, and the periodic payouts to the beneficiary do not depend on the occurrence of a contrary event. See id. Both the payments by the investor and the payout by the annuity company are guaranteed by contract. The unknown variables are the timing of the annuitant's death and whether the investor/beneficiary will either yield a large profit on the investment of its premium in the securities market or simply receive a return of its baseline investment plus interest. We cannot say, therefore, that absent an insurable interest, an annuity with a death benefit is a "purely speculative contract on the life of another." Cronin, 20 R.I. at 572, 40 A. at 497 (emphasis added). By employing an annuitant with a terminal illness, the investor is taking a risk that its investment will be of limited duration. The benefit of the investment's limited duration could result in a heightened chance of yielding a big profit if the investor chose to invest the premiums in a high-risk security with large projected short-term gains, with the risk to the investor hedged by the safety net of the death benefit. The investor, therefore, stood to benefit from a no-lose situation. Ultimately, the absence of an insurable interest in an annuity policy with a death benefit does not transform this kind of policy into the classic wagering contract that is prohibited by our public policy. See Winward, 23 R.I. at 492, 51 A. at 112.

For the reasons set forth above, this Court concludes that an annuity is not infirm for want of an insurable interest when the owner and beneficiary of an annuity with a death benefit is a stranger to the annuitant.

## Question 2

"Does a clause in an annuity that purports to make the annuity incontestable from the date of its issuance preclude the maintenance of an action based on the lack of an insurable interest?"

This question requires us to consider both whether (1) a clause in an annuity policy that makes the policy incontestable from the date of its issuance is enforceable as a matter of public policy and (2) if this clause is enforceable, whether it bars a cause of action that, if successful, would render the entire annuity policy void.  The plaintiff's position is that, because the policy was void ab initio for the lack of an insurable interest, the incontestability clause in the policy never existed, and therefore cannot be used to preclude plaintiff's cause of action against defendant.  The plaintiff contends that incontestability clauses that take immediate effect have been held unenforceable in other jurisdictions, but acknowledges a split of authority on the enforceability of such clauses, reflecting a policy tension between (1) "promot[ing] freedom of contract and hold[ing] parties to the terms of their agreement," and (2) "recognizing that the proponent of fraud should not be rewarded and that insurers must be allowed a reasonable [length of] time to detect fraudulent acts."

The defendant's position is that the incontestability clause precludes plaintiff's declaratory-judgment claim.  The defendant contends that this Court has previously indicated that a term of less than two years for such a clause in an insurance contract could be reasonable and that the common law that has developed in the context of insurance policies should be applied here because plaintiff should be bound by the terms of its own "adhesion contract."  The defendant argues that the clause should also be enforceable against claims of fraud because

plaintiff, as the party issuing the policies, had as much time as it wanted prior to issuance to investigate the veracity of the information provided on the applications for its policies.

Similar to the first question certified to us, this second certified question leads us to an examination of the long-standing common law and more recently enacted statutory law. We have long recognized the validity of the two-year incontestability clause in a life insurance policy as a successful defense against any attempt by the insurer to avoid paying out proceeds under the policy, even when the insurer claims fraud. Murray v. State Mutual Life Insurance Co., 22 R.I. 524, 525-26, 48 A. 800, 801 (1901) (stating that "[i]t has repeatedly been held that an agreement limiting the time within which an action may be brought upon a policy of insurance is not against public policy, and may be enforced, though less than the usual time imposed by law has been fixed"). We also commented in Murray that:

> "[T]he parties to a contract may stipulate for a shorter period of limitation than that provided by law as to all matters which might, in the absence of such stipulation, be set up in avoidance of the contract, would seem to be entirely reasonable; and such is the well-settled rule of law." Id. at 525, 48 A. at 800 (comparing incontestability clauses to statutes of limitation and repose).

Section 27-4-6.2(a)(2), enacted in 2007 (P.L. 2007, ch. 134, § 3), requires every life insurance policy to have either "[a] provision that the policy shall be incontestable * * * for a period of two (2) years from its date of issue" or an incontestability provision that "the director [of business regulation] deems to be more favorable to policyholders * * *."[5] Because the

---

[5] Section 27-4-6.2(a), as enacted in P.L. 2007, ch. 134, § 3, provides, in pertinent part, that:
> "All individual life insurance policies, except as otherwise stated herein, delivered or issued for delivery in this state on or after January 1, 2008 shall contain in substance the following provisions, or provisions which the director deems to be more favorable to policyholders.
> "* * *

purpose of an incontestability clause is to protect the insured from the insurer attempting to avoid its obligations to pay the proceeds from a policy when due, it follows that a period of time less than two years would be more protective of the insured and therefore "deem[ed] to be more favorable to policyholders." Section 27-4-6.2(a); 17 <u>Couch on Insurance</u> § 240:1 (3d ed. 2000); <u>see</u> <u>Murray</u>, 22 R.I. at 525, 48 A. at 800. This statutory section, however, applies only to life insurance policies for the same reasons articulated <u>supra</u> regarding the General Assembly's explicit reference to annuity policies in some sections of chapter 4 of title 27, but not in others. <u>See</u> <u>National Refrigeration, Inc.</u>, 88 A.3d at 1156.

Regardless of the context, however, whether an incontestability clause that takes immediate effect is enforceable is an issue of first impression for this Court. According to a leading treatise on contract law, the arguments in favor of sustaining the enforceability of such a clause include: (1) the insurer drafted the clause and so should be bound by it, and (2) the insurer had an unlimited length of time to investigate the policy applicant prior to issuing the policy and could have discovered whatever errors or misrepresentations might have existed before it accepts the risk of issuing a policy to the applicant. 16 <u>Williston on Contracts</u> § 49.97 at 845-46 (4th ed.

---

"(2) <u>Incontestability</u>. A provision that the policy shall be incontestable after being in force during the lifetime of the insured for a period of two (2) years from its date of issue, and that, if the policy provides that the death benefit provided by the policy may be increased, or other policy provisions changed, upon the application of the policy-holder and the production of evidence of insurability, the policy with respect to each such increase or change shall be incontestable after two (2) years from the effective date of such increase or change, except in each case for nonpayment of premiums. At the option of the insurer, provisions relating to benefits for total and permanent disability and additional benefits for accidental death may be excepted."

2014). The argument against enforcing such a clause is that public policy strives to discourage fraud by not allowing a perpetrator of fraud to profit from the fraudulent behavior. Id.

This Court has previously stated, however, that an incontestability clause is effective even against a defense of fraud because:

> "Where parties enter into a contract which from its nature affords an opportunity to one party to perpetrate a fraud upon another, and it is stipulated therein that the party who is liable to be defrauded shall have a specified time in which to make inquiry as to the acts and conduct of the other party, he is on notice, by the very terms of the contract itself, that fraud may be involved in it, and the duty is upon him to commence at once an investigation into the acts, conduct, and representations of the other party; and if the time fixed is such that the information which would show that the fraud had been perpetrated could have been, by the exercise of ordinary diligence, obtained, then the parties are bound by their contract as to time, and after the lapse of that time fraud is no longer a defense. This does not violate in any way the well-settled principle that fraud is to be abhorred, vitiates everything it touches, and the person guilty of it is not to be countenanced in any way by the courts. While all this is true, it is equally well settled that a contract which has for its foundation a willful fraud may become vitalized and enforceable by the negligence of the party who was the victim of the fraud." Murray, 22 R.I. at 526-27, 48 A. at 801 (quoting Massachusetts Benefit Life Ass'n v. Robinson, 30 S.E. 918, 925 (1898)).

Therefore, the argument that an incontestability clause is unenforceable against a claim or defense of fraud will not prevail in this Court. See id. Whether an incontestability clause that takes immediate effect is included in an insurance policy or in an annuity policy, it is our opinion that the clause is enforceable against all attempts to escape the "deliberately assumed obligation[s]" contained within these contracts. See id. at 526, 48 A. at 801. The following comment that we made in Murray over a century ago remains salient today in the face of evolving products in the financial industry:

> "That the company holds out the [incontestability clause] as an inducement to people to insure, * * * no one can, for a moment,

doubt. It clearly gives every one to understand that, no matter what mistakes may be made in the answers to the numerous questions propounded in the application, which answers are declared therein to be warranties, no advantage can be taken thereof by the company after the expiration of the time limited in the agreement; that his rights under the policy and the rights of those in whose favor it is drawn will then become absolute; and that the beneficiary, after the death of the insured, and perhaps long after the death of all those who knew the facts relating to the transaction, will not be forced into a lawsuit to determine whether the policy ever had any legal force or validity. * * * To hold the company bound by such an undertaking is not to violate any rule of public policy, but is simply to compel it to fulfill its plain and deliberately assumed obligation." Id.

We find it ironic that the plaintiff, the party who drafted the immediately effective incontestability clause, is now seeking to invalidate the clause so that it can escape its obligations under the annuity policy. We are mindful that such a clause could have harsh consequences, especially in light of the appeal currently pending in the First Circuit. Nevertheless, in light of our long-established common law regarding the effect of, and purpose behind, incontestability clauses, it is our opinion that an incontestability clause that takes immediate effect is enforceable, precluding all causes of action that seek to invalidate the policy.

## IV

### Conclusion

For the foregoing reasons, we answer question one in the negative and question two in the affirmative. The papers in the case may be returned to the First Circuit.

**Robinson, J., with whom Indeglia, J., joins, concurring in part and dissenting in part.** I am pleased to be able to concur with the majority's opinion with respect to the second question certified to this Court by the United States Court of Appeals for the First Circuit—i.e.,

- 20 -

that a clause in an annuity that purports to make the annuity incontestable from the date of its issuance precludes the maintenance of an action based on the lack of an insurable interest. However, I must respectfully dissent from the majority's opinion with respect to the first certified question. After an extensive review of this Court's precedent, it is my firm belief that, if the owner and beneficiary of an annuity with a death benefit like the one at issue in this case is a stranger to the annuitant, the annuity is indeed infirm for want of an insurable interest. In my judgment, such an annuity would be an illegal wagering contract and, consequently, void <u>ab initio</u>.

I concede that, as a matter of both statutory and common law, the annuity at issue in this case cannot be considered the equivalent of a life insurance contract; the two are indeed "separate and distinct." Thus, I agree with the majority that the annuity cannot simplistically be treated as our precedent and the General Laws have treated life insurance contracts. However, it is my firm opinion that the focus of this case should not be on asking whether or not the annuity at issue, which contains the "Double Enhanced Death Benefit," is definitionally distinct from a life insurance policy; rather, the focus should be on addressing whether or not the "Double Enhanced Death Benefit" makes this annuity a wagering contract which this Court should refuse to enforce as a matter of venerable and sound public policy.[1] While the majority does address whether this annuity is a wagering contract, I simply cannot assent to its analysis or its ultimate conclusion that this annuity is not a wagering contract.

---

[1]     I note that, even though the United States Court of Appeals for the First Circuit certified only two specific questions to this Court, in its opinion certifying those questions, it stated that it was "uncertain as to whether the [annuity] constitutes an unenforceable wagering contract" and that "[w]hether an insurable interest was required for the [annuity] may * * * depend on whether it can be fairly characterized as a contract wagering on life." <u>Western Reserve Life Assurance Co. of Ohio v. ADM Associates, LLC</u>, 737 F.3d 135, 141, 142 (1st Cir. 2013).

Certain wagering contracts have long been regarded as detrimental to society—the spread of life insurance in England "led to widespread gambling by the middle class on the lives of prominent people" and "attempt[s] to hasten * * * payouts when possible," resulting, in 1774, in the requirement of an insurable interest in the life of the insured. Maria Fleisher, Stranger Originated Life Insurance: Finding a Modern Cure for an Age-Old Problem, 41 Cumb. L. Rev. 569, 571 (2011). Likewise, courts in this country have long held that a contract for insurance upon the life of another requires an insurable interest in the person whose life is insured; the insurable interest requirement makes it "less likely tha[t] criminals at large [will] attempt to compass [the insured's] death." Grigsby v. Russell, 222 U.S. 149, 155 (1911); see also Cronin v. Vermont Life Insurance Co., 20 R.I. 570, 571-72, 40 A. 497, 497 (1898).

Furthermore, the United States Supreme Court has stated that a contract which is a "mere wager" on the death of another "ha[s] a tendency to create a desire for the event. They are, therefore, independently of any statute on the subject, condemned, as being against public policy." Warnock v. Davis, 104 U.S. 775, 779 (1881). Our Court has also consistently taken the position that certain wagering contracts are void; in Cronin, 20 R.I. at 572, 40 A. at 497 (as the majority recognizes), we stated that "a purely speculative contract on the life of another is * * * objectionable, on the grounds of public policy, * * * and such a contract may properly be held to be void."[2] See also Winward v. Lincoln, 23 R.I. 476, 492, 51 A. 106, 112 (1902); Flagg v. Gilpin, 17 R.I. 10, 12-13, 19 A. 1084, 1084-85 (1890); Clark v. Allen, 11 R.I. 439, 443-44

---

[2]    The majority notes that, in Cronin v. Vermont Life Insurance Co., 20 R.I. 570, 572, 40 A. 497, 497 (1898), this Court stated that an annuity, even though it may contain "element[s] of chance," is not infirm for lack of an insurable interest. However, we attributed that fact to a public policy decision. Id. The annuity at issue here contains the "Double Enhanced Death Benefit" and, thus, is not governed by our general statement in Cronin; rather, as the Court in Cronin indicated, we should look to our precedent regarding contracts which are void as against public policy in order to assess the annuity at issue in this case.

(1877). In the course of addressing wagering contracts dealing with the price of commodities, this Court memorably stated:

> "[S]uch contracts are against public policy because they tend to unsettle the natural course of trade, and tempt the parties to them to work for a rise or fall in the prices of the commodities on which their wagers are laid, without regard to actual values, and by methods calculated to promote their own profit at the expense or ruin of others, without reciprocity of benefit. And besides these evils there are others, more immediate to the parties, culminating from time to time in <u>loss</u> <u>of</u> <u>fortune</u> and <u>character</u>, <u>defalcations</u>, <u>crime</u>, <u>and</u> <u>domestic</u> <u>misery</u>, evils which, though they do not always follow, yet follow so often that they have not been overlooked by the courts." <u>Flagg</u>, 17 R.I. at 13, 19 A. at 1085 (emphasis added); <u>see</u> <u>Winward</u>, 23 R.I. at 492, 51 A. at 112 (stating that wagering contracts are contrary to public policy).

As early as 1902, this Court recognized that "[w]agering-contracts * * * are now held to be void and nonenforcible." <u>Winward</u>, 23 R.I. at 492, 51 A. at 112. We added that it was "clear that in the opinion of the [L]egislature public policy forbids the enforcement of all wagers by our courts * * *." <u>Id.</u>; <u>cf.</u> <u>Vogel v. Catala</u>, 63 A.3d 519, 521 n. 3 (R.I. 2013) (referencing G.L. 1956 § 11-19-17, which states that "[a]ll * * * promises, given or made * * * for the repayment of money knowingly lent for * * * betting, shall be utterly void") (internal quotation marks omitted).

In addition to those specific statements regarding wagering contracts, in the very first opinion published by this Court, while refusing to enforce a bet on an election "as tending to debase the character," we stated that "[i]f a contract [has] a <u>tendency</u> to a mischievous consequence it is void." <u>Stoddard v. Martin</u>, 1 R.I. 1, 4-5 (1828); <u>see also</u> Peter J. Comerford, <u>Stoddard v. Martin: A Rhode Island Tale</u>, 62 R.I. B.J. 13, 16 (March/April 2014) (stating that the bet at issue in <u>Stoddard</u> was unenforceable because it tended to cause the parties to act immorally). Our jurisprudence also indicates that "a contract term is unenforceable * * * if it

violates public policy" and that such a contract term violates public policy if it is "injurious to the interest of the public, * * * interferes with the public welfare or safety, * * * is unconscionable[,] or * * * tends to injustice or oppression." NV One, LLC v. Potomac Realty Capital, LLC, 84 A.3d 800, 807 (R.I. 2014) (internal quotation marks omitted); see also Gorman v. St. Raphael Academy, 853 A.2d 28, 39 (R.I. 2004).

Thus, a thorough and careful review of our precedent leads me to the conclusion that, if the annuity at issue, which significantly includes the "Double Enhanced Death Benefit," can be said to be a wagering contract and against public policy, it is void, regardless of whether we title it an annuity or a life insurance contract. My careful review of the record has led me to the definite conviction that the annuity at issue in this case is indeed an illicit (and void) wagering contract.

In reaching my conclusion, I have focused on the fact that the annuity in question bears the hallmarks of a wagering contract of the type which this Court has condemned, regardless of the fact that it cannot be classified as a life insurance contract. See Winward, 23 R.I. at 492, 51 A. at 112. If one turns to the reason that certain wagering contracts were determined to be void without an insurable interest—namely, the concern that the individual who would profit from the death of the other individual involved has a motive to potentially harm that individual—it becomes clear that the annuity in this case is an impermissible wagering contract. See Grigsby, 222 U.S. at 155; Warnock, 104 U.S. at 779. The same concern for the well-being of the insured that was focused upon in Grigsby and Warnock is present in this case. This annuity allows the owner of the annuity to gamble on how well his or her investments will be doing at the time of the death of the annuitant. Due to the "Double Enhanced Death Benefit," if the market is performing well, the owner of the annuity would have an incentive to end the life of the

- 24 -

annuitant in order to reap a larger gain. I acknowledge, however, that it could also be the case that the market is doing poorly and that the "Double Enhanced Death Benefit" would provide the owner of the annuity with just the value of what he or she has put into the annuity plus interest, upon the death of the annuitant. But the fact that there is one feasible set of circumstances under which there would be no motive to harm the annuitant does not change the fact that there are circumstances created by the "Double Enhanced Death Benefit" whereby the owner of the annuity would have a strong incentive to harm the annuitant. Such a contract is at odds with the best interest and safety of the public and, in my judgment, could lead to "injustice or oppression." NV One, LLC, 84 A.3d at 807. Thus, it is my view that the annuity at issue cannot be reconciled with important and venerable principles of public policy. Id.; see also Grigsby, 222 U.S. at 155; Warnock, 104 U.S. at 779.

Moreover, I would point out that it could certainly be said that the annuity at issue, which includes the "Double Enhanced Death Benefit," is a contract that has a "tendency to a mischievous consequence," such as the one we struck down in Stoddard, 1 R.I. at 4. Indeed, this particular annuity scheme did lead to mischievous consequences; it led to an array of criminal charges, and it also led to a loss of "fortune and character" for Joseph Caramadre—a further indication that the annuity is against public policy. Flagg, 17 R.I. at 13, 19 A. at 1085; see also Western Reserve Life Assurance Co. of Ohio v. ADM Associates, LLC, 737 F.3d 135, 138 n. 2 (1st Cir. 2013) (noting that Mr. Caramadre had, at the time, been charged with "sixty-five counts of fraud, conspiracy, identity theft, and money laundering" and citing United States v. Caramadre, 882 F. Supp. 2d 302, 304 (D.R.I. 2012)).

In responding to the argument made by the majority, I find it desirable to address how to define a wagering contract and how to contextualize the particular definitional language in

Winward, 23 R.I. at 492, 51 A. at 112, on which the majority relies.  The opinion in Winward defined a wagering contract as follows:

> "[(1)] an agreement by one party to pay another a sum of money, or give something of value if a certain event happens; and [(2)] a reciprocal agreement by the second party to pay the first a sum of money or give something of value if a certain contrary event happens; and, [(3)] that the events contemplated in the agreement shall be something other than the passing of a consideration between the parties."  Winward, 23 R.I. at 492, 51 A. at 112.

The majority contends that the annuity before us does not fit within the parameters of the just-quoted definition.  The majority also contends that the annuity at issue, which contains the "Double Enhanced Death Benefit," is not a wagering contract because it is not "purely speculative."  Cronin, 20 R.I. at 572, 40 A. at 497.  In my opinion, however, the majority errs by rather myopically focusing on the specific language in Winward and Cronin, while simultaneously disregarding our voluminous precedent, discussed supra, with respect to contracts which are against public policy.  I would also point out that the definition in Winward was articulated well over a century ago, and the drafters thereof could not have foreseen and taken into account an annuity like the one at issue in this case, which so very significantly contains the "Double Enhanced Death Benefit."  Moreover, a wagering contract can also be defined as "[a] contract made entirely for sport, the performance depending on the happening of an uncertain event."[3]  Black's Law Dictionary 399 (10th ed. 2014).  That definition would arguably apply to

---

[3]  Following the above-quoted definition, in way of further explanation, Black's Law Dictionary provides as follows:

> "Although wagering and gaming agreements were generally enforceable under the English common law, they were condemned in most American states, in part because they were thought to encourage shiftlessness, poverty, and immorality, and in part[] because they were regarded as too frivolous to be worthy of judicial attention. Irwin v. Williar, 110 U.S. 499 (1884) ('In

- 26 -

the annuity at issue in this case as the owner (ADM Associates, LLC) was wagering on how well its investments would have done at the time of the annuitant's death—an uncertain event.[4]

Accordingly, although I am pleased to join the majority in its analysis and holding with respect to the second certified question, I respectfully dissent from its holding and reasoning with respect to the first certified question. I would conclude that this annuity contract, which contains the "Double Enhanced Death Benefit," is a wagering contract and, as such, is against public policy. Therefore, in my opinion, said contract was void <u>ab initio</u>.

---

England it is held that the contracts, although wagers, were not void at common law, * * * while generally, in this country, all wagering contracts are held to be illegal and void as against public policy.')[.]" Black's Law Dictionary 399 (10th ed. 2014) (quoting E. Allan Farnsworth, <u>Contracts</u> § 5.2 n. 4, at 326-27 (3d ed. 1999)) (internal quotation marks omitted).

Additionally, Black's Law Dictionary further defines a wagering contract as: "A contract in which performance depends on a business transaction or outcome. * * * With this type of wagering contract, a business person is protected from a trade risk." <u>Id.</u> In my judgment, both the explanation provided and the additional definition support the conclusion that the annuity at issue in the instant case, which contains the "Double Enhanced Death Benefit," is a wagering contract.

[4] In the interest of absolute clarity I wish to state that my conclusion in this case could very well have been different had this annuity not contained the "Double Enhanced Death Benefit;" it is that portion of the annuity which, in my opinion, renders it void.



| | |
|---|---|
| **TITLE OF CASE:** | Western Reserve Life Assurance Co. of Ohio v. ADM Associates, LLC. |
| **CASE NO:** | No. 2014-35-M.P. |
| **COURT:** | Supreme Court |
| **DATE OPINION FILED:** | June 17, 2015 |
| **JUSTICES:** | Suttell, C.J., Goldberg, Flaherty, and Robinson, and Indeglia, JJ. |
| **WRITTEN BY:** | Chief Justice Paul A. Suttell |
| **SOURCE OF APPEAL:** | N/A |

**JUDGE FROM LOWER COURT**: N/A

This came case before the Supreme Court pursuant to a question certified by the United States Court of Appeals for the First Circuit in accordance with Article 1, Rule 6 of the Supreme Court Rules of Appellate Procedure.

**ATTORNEYS ON APPEAL:**

For Plaintiff: Michael J. Daly, Esq.

For Defendant: Robert F. Weber, Esq.